IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Leroy Earl Betz, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 3:12-CV-02152 |
| | : | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | : | (Judge Kane) |
| | : | |
| | : | |
| | : | |
| Defendant | : | |

## **MEMORANDUM**

Plaintiff Leroy Earl Betz has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Betz's claim for social security disability insurance benefits. (Doc. 1).

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. Betz met the insured status requirements of the Social Security Act through March 31, 2013. Tr. 30, 132. In order to establish entitlement to disability insurance benefits Betz was required to establish that he suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

I. **BACKGROUND**

Betz protectively filed his application for disability insurance benefits on May 27, 2009, claiming that he became disabled on June 3, 2009.  Tr. 30, 112, 132.  Betz has been diagnosed with several impairments, including: hypertension, atherosclerotic heart disease status post cardiac catheterization, seizure disorder, and anxiety disorder.  Tr. 32.  On August 14, 2009, Betz's application was initially denied by the Bureau of Disability Determination.  Tr. 90.

On September 25, 2009, Betz requested a hearing before an administrative law judge ("ALJ").  Tr. 95.  The ALJ conducted a hearing on September 1, 2010, where Betz was represented by counsel.  Tr. 53-87.   On October 4, 2010, the ALJ issued a decision denying Betz's application.  Tr. 30-38.  On September 10, 2012, the Appeals Council declined to grant review.  Tr. 1.  Betz filed a complaint before this Court on October 31, 2012.  (Doc. 1).  Supporting and opposing briefs were submitted and this case became ripe for disposition on June 17, 2013, when Betz filed a reply brief.  (Docs. 23, 25, 26).

Betz appeals the ALJ's determination on three grounds: (1) the ALJ erred by failing to consider certain evidence, (2) the ALJ improperly discounted Betz's credibility, and (3) the ALJ's residual functional capacity determination was not supported by substantial evidence.  (Doc. 23).  For the reasons set forth below, the decision of the Commissioner is affirmed.

II. **STATEMENT OF RELEVANT FACTS**

Betz was 63 years of age at the time of the ALJ's decision, is a high school graduate, and is able to read, write, speak, and understand the English language. Tr. 36, 134, 143. Betz's past relevant work included work as a payroll coordinator, which is classified as sedentary, semi-skilled work. Tr. 80-81.

    A.    **Betz's Impairments**

Betz has been diagnosed with seizure disorder, but reported to his primary care physician, Gary Kanouse, M.D., that his last seizure occurred in 1983. Tr. 370, 372. In 2008, Betz was experiencing chest pain; consequently, he presented for a series of tests in November 2008. Tr. 294. A myocardial perfusion scan revealed an area of "fixed ischemia near the apex in the anterior septum." Id. As a result, in February 2009, Betz underwent a left heart catheterization. Tr. 311-12.

On June 11, 2009, Betz presented to Mitchell Gross, M.D. for a neurological evaluation relating to his social security disability application. Tr. 436. Betz informed Dr. Gross that he was unemployed "due to [the] closing of [the] business he was working for." Tr. 437. Betz reported that his first seizure had occurred when he was fourteen years old. Id. At the age of twenty-one, Betz suffered from a grand mal seizure[1] and was placed on Dilantin; in 1983 doctors tried to wean him

---

[1] Grand mal seizures are severe; these "seizures have two stages: [1] Tonic phase. Loss of consciousness occurs, and the muscles suddenly contract and cause the person to fall down. This phase tends to last about 10 to 20 seconds. [2] Clonic phase. The muscles go into rhythmic

off of Dilantin, leading to his last grand mal seizure. Id. Betz complained that he had ongoing issues with anxiety and was unable to work in open spaces. Id.

Dr. Gross observed that Betz was well-groomed and cooperative. Tr. 438. Betz appeared "slightly anxious during the [the] interview and offer[ed] little eye contact for any prolonged period of time." Id. However, Betz was alert and oriented, his speech was clear, and his judgment, attention, and concentration were all appropriate. Tr. 438-39. Betz was able to recall three out of three objects immediately and two out of three objects after three minutes; with a brief hint he was able to recall the third object. Tr. 439. Dr. Gross also noted that Betz did "extremely well on serial 7s." Id.

Dr. Gross diagnosed Betz with seizure disorder, but noted that Betz was "stable on Dilantin." Id. Dr. Gross opined that Betz "has not had a seizure since 1983 and certainly had no clear disability related to his epilepsy because he is so well controlled on his Dilantin." Id. Dr. Gross also diagnosed Betz with anxiety/panic disorder; he noted that "per [Betz's] history, it appears that this is more affecting his ability to work than his epilepsy." Id. Dr. Gross recommended psychiatric evaluation and treatment for this disorder, but did note that Betz was already taking Xanax and imipramine for his anxiety. Id.

---

contractions, alternately flexing and relaxing. Convulsions usually last for less than two minutes." Mayoclinic.com, Grand mal seizure, *available at* http://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/basics/symptoms/CON-20021356 (last visited July 30, 2014).

On March 18, 2010, Betz presented to Dr. Kanouse for a routine visit, and reported no new problems. Tr. 509. Dr. Kanouse noted that Betz was using less Xanax. Id. Betz reported that his last visit with his psychologist, Carl Charnetski, Ph.D., had been in May of 2009. Id.

On July 7, 2010, Dr. Charnetski wrote a letter detailing Betz's symptoms related to his anxiety disorder. Tr. 498. Betz's anxiety included social phobia which manifested in public domains and the workplace. Id. Symptoms included, inter alia, nervousness, fear, panic, mental disintegration, apprehension, tremors, bodily pains, weakness and fatigability, restlessness, increased heart rate, dyspnea, sweating, and face flushing. Id. Dr. Charnetski stated that he had treated Betz's anxiety primarily with "progressive muscle relaxation, autogenics and visualization, combine with a systematic desensitization protocol." Id.

### B. New Evidence

At the administrative hearing, the ALJ stated that "the claimant had received over 20, 25 years of treatment with Carl Charnetski and we only have a one page letter from him. And so I'd like to leave the case open for medical records from him . . . I will leave it open for two weeks in order to get the medical records from Dr. Charnetski." Tr. 85. On October 2, 2010, thirty-one days after the hearing and well after the record closed, Betz's attorney submitted the records from Dr. Charnetski. Tr. 529-632.

Dr. Charnetski's records are generally brief and are mostly written in short-hand. Id. These records reveal that Betz began treatment with Dr. Charnetski in March of 1985 due to social anxiety; the treatment records continue until April 6, 2009. Id. Initially Betz was treated up to three times per week but by 2009, Betz was being treated approximately twice per month. Id. Most of the treatment records add little insight into Betz's mental condition and abilities; the records contain brief notes such as "doing ok," "bad day," "doing well," and "doing pretty good." Id. However, to the extent that these records reveal any information about Betz's condition, they generally show that his condition was slowly improving.

In 1985, Betz was anxious around people and had issues in public. Tr. 593-94. By 1987 Betz reported that he was doing "better at work with other people, [and was] more resilient than before." Tr. 529. In 1989, Betz started a new job that required him to be in numerous open places around other people; despite this, he did not require an increase in medication. Tr. 585. By 1990, Betz was interviewing job applicants, and by 1992 he was "able to deal with confronting supervisor[s] very effectively." Tr. 567, 579. In 2008, Betz vacationed with his grandchildren without issues; Dr. Charnetski opined that "this is a good indication of handling change" well. Tr. 598. In early 2009, Betz was doing well at work. Tr. 596. At Betz's last treatment session, Dr. Charnetski wrote: "Discussed his plant closing and his situation with them. Treatment terminated[,] advised

continuing using coping mechanisms developed here – feels confident he'll be allright [sic]." Id.

### C. Residual Functional Capacity Assessments

On July 29, 2009 Edmund Popielarski, M.D., a non-examining state agency physician, offered a physical residual functional capacity assessment of Betz. Tr. 468-74. Dr. Popielarski opined that Betz was capable of lifting and carrying up to fifty pounds occasionally, and up to twenty-five pounds frequently. Tr. 469. Otherwise, Betz was not limited in any way. Tr. 369-74.

On August 13, 2009, Joseph Barrett, Ph.D., a state agency physician, offered a mental residual functional capacity assessment of Betz. Tr. 475-91. Dr. Barrett believed that Betz's impairments led to mild restrictions in his activities of daily living, and mild difficulties in maintaining social functioning. Tr. 485. Additionally, they caused moderate difficulties in maintaining concentration, persistence, or pace, and had resulted in one or two repeated episodes of decompensation. Id. Dr. Barrett noted that Betz seemed "preoccupied with his subjective issues, but he seems capable of simple tasks." Tr. 487.

Dr. Barrett opined that Betz was moderately limited in his ability to carry out detailed instructions, and moderately limited in his ability to respond appropriately to changes in the work setting. Tr. 488-89. Otherwise, Betz was "not significantly limited" in any way. Id. Dr. Barrett stated that Betz "retains the

capacity to perform simple, routinized tasks. The limitations resulting from the impairment do not preclude the claimant from performing the basic mental demands of competitive work on a sustained basis. There are no restrictions in his abilities in regards to understanding and memory and social interaction." Tr. 490.

### C.   The Administrative Hearing

On September 1, 2010, Betz's administrative hearing was conducted. Tr. 53-87. At that hearing, Betz testified that, while he suffered from seizure disorder, his "anxiety is the crippling part." Tr. 56. Betz stated that anxiety caused his body to freeze up; he was unable to concentrate around other people, and questions would cause him to "basically freeze up." Tr. 56-57. Betz was able to work at his previous job because he had a closed off office and had minimal contact with other people. Id. If he had to communicate with other employees, his body would tense up and he would be unable to speak. Tr. 63.

Betz stated that work related stress caused petit mal seizures.[2] Tr. 66-67. Treatment with Dr. Charnetski helped Betz significantly in certain aspects of his life, but "couldn't correct the extreme anxiety in the workplace." Tr. 70-71. Betz

---

[2] Petit mal seziures, also call absence seizures, "involve brief, sudden lapses of consciousness. They're more common in children than adults. Someone having an absence seizure may look like he or she is staring into space for a few seconds. This type of seizure usually doesn't lead to physical injury. Absence seizures usually can be controlled with anti-seizure medications." Mayoclinic.com, Absence seizure definition, *available at* http://www.mayoclinic.org/diseases-conditions/petit-mal-seizure/basics/definition/con-20021252 (last visited July 31, 2014).

testified that he chose his alleged onset date because his employer went out of business, and the new owner did not offer him employment at the new company. Tr. 58.  Betz was not sure how much longer he could have worked had the new employer offered him a similar office.  Id.

Betz stated that, on a typical day, he woke up in the morning and would get dressed; this would take him two to two-and-a-half hours because, as Betz explained, "my brain doesn't function properly until I'm moving a couple of hours."  Tr. 59.  After dressing, Betz would help with household chores, such as laundry and sweeping.  Id.  However, he would not do the grocery shopping because of his social anxiety issues.  Id.  Betz stated that the hardest part of his diability was the fact that it is a "hidden disability," and that people "look at me and think there's nothing wrong."  Tr. 60.

After Betz testified, his wife, Linda Betz, was called to offer testimony.  Tr. 71-72.  Ms. Betz testified that Betz generally had difficulty running errands alone and needed someone to accompany him if he had not previously performed those errands.  Tr. 73.  Betz rarely went out alone.  Tr. 77-78.  Ms. Betz stated that Betz's tolerance level was very low, and he was easily frustrated or "set off."  Tr. 75.  She did not believe that her husband was capable of working even in a "simple situation" because he would become extremely upset and agitated "if something doesn't work right."  Tr. 77.  Ms. Betz testified that she and her husband had

9

season tickets to football games, attended their grandchildren's sporting events, and went out to dinner with friends "a couple of times a year." Tr. 79-80. Additionally, Betz enjoyed hunting with his son and a close friend. Tr. 80.

After Ms. Betz testified, Nadine Henzes, an impartial vocational expert, was called to give testimony. Tr. 80. The ALJ asked Ms. Henzes to assume a hypothetical individual who was limited to medium work.[3] Tr. 46. However, the hypothetical individual should avoid exposure to hazards such as dangerous heights and moving machinery, and was limited to "simple routinized tasks." Id.

Ms. Henzes opined that this hypothetical individual would not be able to perform Betz's past relevant work. Id. However, the hypothetical individual would be capable of performing three other jobs that exist in significant numbers in the national economy: a bagger, a cashier, and a packer. Tr. 81-82. The ALJ then modified the hypothetical question to include requirements that the individual could make no decisions, have no changes in the work setting, no interaction with the public or coworkers, and only occasional supervision. Tr. 82. Ms. Henzes testified that with these limitations, the hypothetical individual would be unable to perform any work in the national or regional economy. Tr. 85.

---

[3] Medium Work is defined by the regulations of the Social Security Administration as work that "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work." 20 C.F.R. § 416.967.

III.     **DISCUSSION**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520. The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Mason, 994 F.2d at 1064.

### A. The ALJ's Development of the Record

Betz first argues that the ALJ erred by failing to accept or recognize the evidence that Betz submitted after the record had closed. (Doc. 23). As an initial matter, it is not entirely clear that the ALJ was ever presented with the evidence that Betz's counsel submitted. Betz's attorney stated that he submitted the evidence on Saturday, October 2, 2010. (Doc. 23, p. 14). The ALJ issued her opinion on Monday, October 4, 2010. Tr. 38. The ALJ likely would not have reviewed new evidence over the weekend, and Betz has not demonstrated that the ALJ was presented with the new evidence on Monday prior to filing her decision. However, even if the ALJ had received the evidence, she had previously closed the record; therefore the evidence was not submitted in a timely manner.

At the conclusion of the administrative hearing, the ALJ recognized that Dr. Charnetski's treatment notes may have been of some value in deciding the case. Tr. 85. Therefore, the ALJ stated that she would "leave [the record] open for two weeks" to allow Betz's attorney to obtain these records. Id. The ALJ asked Betz's attorney if it was okay that he obtain the records rather than the ALJ; Betz's attorney replied that it was. Tr. 85. The ALJ informed Betz's attorney that "[i]f for some reason [] you can't get them, let me know and . . . I'll send a subpoena and try and get those records." Tr. 85-86. After a brief discussion, the ALJ again

13

reminded Betz's attorney to let her know if he was unable to obtain the records so that she could issue a subpoena. Id.

By September 16, 2010, Dr. Charnetski's records had not been submitted to the ALJ; on that date, the record closed. Tr. 85. Betz's attorney did not ask for an extension of time to obtain the records, nor did he ask the ALJ to issue a subpoena to obtain the records. The ALJ had no reason to believe the records were forthcoming, and no reason to believe that Betz's attorney required assistance or extra time in obtaining the records.

Under these circumstances, the ALJ did not err in failing to consider the post-hearing evidence submitted by Betz's attorney. See, Taylor v. Colvin, No. 12-4130-JWL, 2013 WL 6229370, at *3 (D. Kan. Dec. 2, 2013) ("The court finds no error in [] the ALJ's failure . . . to expressly consider Dr. Bradshaw's post-hearing opinion. With respect to the ALJ's failure to consider the opinion, plaintiff has not shown the court that the opinion was ever made part of the record before the ALJ"); Ostigny v. Comm'r of Soc. Sec., No. 12-477-SJD-JGW, 2013 WL 4605647, at *3 (S.D. Ohio Aug. 29, 2013) (Although a medical report was submitted prior to the ALJ's decision, because the "report was not submitted until over ten days after the expiration of the deadline for submitting post-hearing evidence, the ALJ did not err by failing to address the report"); Franson v. Comm'r of Soc. Sec., 556 F. Supp. 2d 716, 723 (W.D. Mich. 2008) (holding that, where the

14

plaintiff's attorney sent medical records to the ALJ after the record closed, but before the opinion was filed, "[a]ny fault relating to the ALJ's purported 'failure to consider' plaintiff's post-hearing exhibits rests squarely on plaintiff's attorney's shoulders," and "the ALJ was under no obligation to consider the 'evidence'" submitted post-closing).

Furthermore, even if the ALJ was obligated to consider the evidence, any failure to evaluate Dr. Charnetski's medical records was harmless. As detailed previously, Dr. Charnetski's treatment notes shed little light on Betz's impairment and concomitant limitations. Tr. 529-632. The records do reflect that Betz sought frequent treatment from Dr. Charnetski for a period of approximately twenty-four years; however, this fact was never in genuine dispute. When the ALJ granted more time for Betz's attorney to seek these medical records, she stated "I understand that the claimant had received over 20, 25 years of treatment with Carl Charnetski . . ." Tr. 85. What little information these medical records did provide indicated that Betz was better able to control his symptoms, and grew progressively more comfortable handling the stress associated with work. Tr. 529, 567, 579, 585 593-94, 596, 598. Given the nature of these records, there is no indication that the evidence would have affected the outcome of the case. Thus,

remand is not warranted.[4] Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

### B. Assessment of Betz's Credibility

Next, Betz challenges the ALJ's determination that his testimony and subjective complaints were not entirely credible. Tr. 35-36. Betz argues that the ALJ's decision was not based on a consideration of "all of the evidence."[5] (Doc. 23). An ALJ's credibility determination is entitled to deference by the district court because "he or she has the opportunity at a hearing to assess a witness's demeanor." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

Here, the ALJ found that Betz's subjective complaints were not entirely credible. Tr. 35-36. The ALJ found that Betz's complaints were undermined by several facts. First, the ALJ noted that medical records did not substantiate "that he had seizures to the extent as he alleged." Tr. 36. In that vein, there were no medical records showing that Betz ever complained of ongoing seizures. At Betz's neurological consultation with Dr. Gross, he reported that he had not suffered from

---

[4] For this reason, sentence six remand would not be appropriate because the evidence is not material. See, Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir.1984) ("The materiality standard [for sentence six remand] requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination").

[5] Betz also argues that the ALJ failed to consider Betz's long work history, as required by Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979). While the ALJ did not mention Betz's work history in her opinion, the hearing transcript makes clear that the ALJ did consider Betz's work history. Betz stated "I, I wanted to work as long as I could and I'm, I'm proud of myself for making it as far as I did." Tr. 86-87. The ALJ responded "I saw that you had a good work history." Tr. 87. After Betz implored the ALJ to consider this history, the ALJ stated that she would consider it. Id. Consequently, Betz's argument is without merit.

16

a seizure since 1983; Dr. Gross opined that Betz did not suffer from any disability related to his epilepsy since the seizures were "so well controlled." Tr. 439.

Second, the ALJ found it significant that Betz had not stopped working due to his impairments, but rather stopped working because the company he worked for went bankrupt. Tr. 36. Third, the ALJ noted that Betz's activities of daily living were inconsistent with his subjective complaints. Id. The ALJ believed that, given that Betz attended football games, performed functions in church, and went hunting with others, his complaints of social phobia were likely overstated. Id. The ALJ also observed that Betz had failed to produce Dr. Charnetski's medical records, despite the fact that it was Betz's burden to prove his disability. Id. While Betz did eventually produce these records, the records did little to help establish Betz's disability. Tr. 529-632. Given the totality of evidence contained within the administrative record and the deference that is properly owed to an ALJ's credibility determination, the ALJ's decision to discount Betz's credibility and subjective complaints is supported by substantial evidence.

### C. Residual Functional Capacity Determination

Finally, Betz argues that the ALJ erred in finding that Betz could perform work that exists in significant numbers in the national economy. Tr. 37-38. Specifically, Betz argues that the Ms. Henzes' testimony undermines the ALJ's finding. (Doc. 23). The ALJ's decision is undermined, Betz argues, by Ms.

Henzes' statement that an individual who required no decision making, no changes in the work setting, no interaction with the public or co-workers, and only occasional supervision would be unemployable. Tr. 84-85.

A "vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the [ALJ's hypothetical] question accurately portrays the claimant's individual physical and mental" limitations.  Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). However, the hypothetical question need not convey every alleged impairment; the hypothetical question must convey only "a claimant's *credibly established limitations*."  Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (emphasis in original).

Ms. Henzes did testify that an individual would be unable to sustain gainful employment if he or she required a job with the aforementioned limitations.  Tr. 84-85.  Thus, if the ALJ had accepted Betz's subject complaints as true, she would be required to find that Betz was disabled.  However, the ALJ rejected Betz's alleged symptoms and subjective complaint, and found that his "statements concerning the intensity, persistence and limiting effects of these symptoms are only partially credible."  Tr. 36.  Thus, Betz's alleged limitations in decision making and social interaction were not credibly established.  As previously discussed, the ALJ's credibility conclusion was supported by substantial evidence

and, consequently, the hypothetical question posed to the vocational expert was not flawed.

Additionally, Betz's argument is undermined by the fact that no doctor ever opined that Betz was disabled, and no doctor ever opined that Betz was more limited than the ALJ found him to be.  See, Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports his allegations that his pain and exertional limitations are more severe than the ALJ found them to be."); Thompson v. Halter, 45 F.App'x 146, 148 (3d Cir. 2002) (citing Hutton v. Apfel, 175 F.3d 651 (8th Cir. 1999); Dumas v. Schweiker, 712 F.2d 1545 (2d Cir. 1983)) ("Most importantly, [no doctor] opined that [the claimant] could not work . . . While the absence of such a statement is not dispositive of the issue of disability, it is surely probative of non-disability.").  Consequently, the ALJ's residual functional capacity determination was supported by substantial evidence.

IV.   **CONCLUSION**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An order consistent with this memorandum follows.

BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge

Dated: August 6, 2014